ALLIED INDUSTRIAL SERVICE CORP., APPELLEE, *v.*
KASLE IRON & METALS, INC., APPELLANT.

(No. L-77-071—Decided December 30, 1977.)

*Mr. Theodore M. Rowen* and *Mr. Gary D. Sikkema,* for appellant.

*Mr. Joseph P. Jordan,* for appellee.

BROWN, J.   Defendant Kasle Iron & Metals, Inc., appeals the overruling of its motion for a new trial and the underlying judgment in favor of Allied Industrial Service Corp., the plaintiff, in the amount of $22,221.47, plus interest.

This case arose as follows. Kasle is engaged in the business of processing scrap iron. In May 1974, the Toledo Pollution

Control Agency issued a complaint against Kasle for the emission of air pollution from an automobile shredder—specifically, a blue haze generated during the shredding of automobiles by the heating of crankcase and power drain oil and fibrous particles emitted during the shredding of automobile upholstery. Kasle hired Allied to design a system and prescribe equipment to control these pollutants.

Allied proposed to design a system in two stages, the first being the control of the oil haze. Pursuant to a letter dated November 22, 1974, Allied proposed that in the first stage electrostatic precipitators manufactured by American Air Filter Company be used. Kasle accepted this proposal and issued purchase orders for this equipment. Those orders were cancelled by mutual agreement when American Air refused to warrant its equipment against in-system explosions.

Allied then proposed, in a letter dated February 11, 1975, to use similar equipment from other sources at an increased cost. Kasle agreed to this proposal and the system designed by Allied was installed in Kasle's yard.

When tested, the system did not completely eliminate the haze, and when Allied failed to make corrections to Kasle's satisfaction, Kasle terminated its relationship with Allied and hired another engineer to solve its air pollution problems. Allied sued Kasle for the balance due for services performed. Kasle counterclaimed for breach of contract, breach of warranty, and negligent performance.

Following a non-jury trial, the court below entered a judgment in favor of Allied. It is from that judgment and the overruling of its subsequent motion for a new trial that Kasle appeals.

Kasle's first assignment of error reads:

"The trial court erred in finding that no warranty existed on the performance of the pollution control system."

The trial court found that the installation of the pollution control equipment was unique and that there were no guarantees or warranties made that the installation would solve Kasle's problem. There is substantial probative evidence in the record to support the conclusion that Allied gave no *express* warranty on the performance of the system designed for Kasle. Allied's February 11, 1975, proposal describing the system to be installed contained no promises or guarantees.

146

Greenwald, the President of Allied, advised Kasle in a letter dated January 10, 1975, and the Toledo Pollution Control Agency in a letter dated August 28, 1974, that there was little data available from manufacturers on dust and fume control systems for shredder installations. Greenwald testified that he neither intended nor promised a complete solution to Kasle's problem. Don Moline, the engineer from the Toledo Pollution Control Agency assigned to the Kasle case, testified that he had been present at meetings with Nistel, the president of Kasle, when the lack of a guarantee of the equipment was discussed. Further, the record contains a copy of a letter from Moline to Nistel dated March 27, 1975, responding to Nistel's request to review the plans for the system that was ultimately installed, in which Moline wrote: "***[W]e must also join the long list of people who cannot guarantee this equipment. We can only say that based on our previous experience, it is plausible."

However, Kasle alleges that even if no express warranty be found, Allied was a merchant pursuant to the provisions of R. C. Chapter 1302, and therefore subject to the provisions of that chapter relative to *implied* warranties of fitness (R. C. 1302.28) and merchantability (R. C. 1302.27).

R. C. Chapter 1302 applies only to transactions in goods. R. C. 1302.02. "Goods" are defined in R. C. 1302.01(A)(8) as follows:

" 'Goods' means all things (including specially manufactured goods) which are moveable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities, and things in action. 'Goods' also includes the unborn young of animals and growing crops and other identified things attached to realty as described in section 1302.03 of the Revised Code."

We find that Allied was not a seller of "goods" as that term is defined in R. C. 1302.01(A)(8). Allied's business was to design, install and service pollution control systems. Pursuant to an agreement with Kasle, Allied analyzed Kasle's pollution problem, proposed what equipment should be used and how it should be incorporated in a system to control that problem, ordered the equipment and installed it. In effect, Allied sold Kasle a combination of goods and services for a total non-itemized price of approximately $60,000.

We find no reported Ohio case law dealing with a combined sale of goods and services. However, courts of other states have analyzed this situation in relation to their own sales statutes, which statutes, like R. C. 1302.01, are derived from U.C.C. 2-105. Having reviewed the out-of-state cases, we adopt the following approach developed in a case such as the one before us which involves a mixed goods and services contract: the test for the inclusion in or the exclusion from sales provisions is whether the predominant factor and purpose of the contract is the rendition of service, with goods incidentally involved, or whether the contract is for the sale of goods, with labor incidentally involved.* In applying the predominant factor test, we find that Allied was selling its services in the design and installation of a pollution control system, and that the goods ordered and installed, *i.e.* the particular filters, ductwork, hood, etc. were incidental to the labor. Allied was, in effect, Kasle's agent in purchasing the equipment since Kasle approved the particular equipment recommended before it was ordered. Therefore, we find that Allied is not a seller of goods and not subject to the implied warranties of R. C. Chapter 1302.

Moreover, even if it could be said that Allied was a seller of goods within the scope of R. C. Chapter 1302, we find that the implied warranties of R. C. 1302.27 and R. C. 1302.28 would be excluded in this case by the course of dealing between the parties. See R. C. 1302.29(C)(3).

For the above reasons, we find that the first assignment of error is not well taken.

Kasle's second assignment of error states:

"The trial court erred in not finding that plaintiff was negligent in its design of the air pollution control system for defendant."

The issue raised in this assignment of error narrows down to whether Greenwald breached the standard of care imposed

---

* See, *Bonebrake* v. *Cox* (C.A. 8, 1974), 499 F. 2d 951; *Cleveland Lumber Co.* v. *Proctor & Schwartz, Inc.* (N.D. Ga. 1975), 397 F. Supp. 1088; *Burton* v. *Artery Co., Inc.* (1977), 279 Md. 94, 367 A. 2d 935; *United States Fidelity and Guaranty Co.* v. *North American Steel Corp.* (Fla. App. 1976), 335 So. 2d 18; *Gulash* v. *Stylarama, Inc.* (1975), 33 Conn. Supp. 108, 364 A. 2d 1221; *Schenectady Steel Co., Inc.* v. *Bruno Trimpoli Gen. Constr. Co.* (1974), 43 A.D. 2d 234, 350 N.Y.S. 2d 920, affirmed 359 N.Y.S. 2d 560, 316 N.E. 2d 875.

on one in his profession, pollution control engineering, in designing the first stage of the air pollution control system for Kasle. The record contains substantial probative evidence that Greenwald conformed to the standard of care of the profession. Greenwald observed Kasle's hammermill operation extensively before proposing a pollution control system. Although Kasle's expert witness testified that the system should not have been designed without gas rate and particulate loading tests, he made an exception when the tests were unnecessary due to experience with similar operating systems or the costs were prohibitive. Greenwald testified that he did not perform such tests because the problems at Kasle were obvious from visual observation and because the tests were expensive. In addition, Greenwald attended meetings with the Toledo Pollution Control Agency. He and Nistel traveled to Ontario, Canada, and to Washington Courthouse, Ohio, to observe the pollution control equipment being used in hammermill operations in those locations. Greenwald contacted manufacturers of various types of pollution control equipment which he considered might be useful in Kasle's situation, and discussed alternate systems with Nistel. Kasle's expert witness admitted that the concept of Greenwald's system was valid, and criticized the design of the system only on the ground that it was under-designed, *i.e.*, the ventilation rate was not high enough to prevent continued emission of oil mist from the feed end of the shredder. Kasle's expert recommended that the system be retained, but modified to correct the under-designed problem, primarily by the installation of a larger motor to increase the fan capacity.

The evidence supports the conclusion that Greenwald did not breach the standard of care expected of a pollution control engineer in designing the first stage of the control system for Kasle. Accordingly, we find that the second assignment of error is not well taken.

Therefore, the judgment of the Lucas County Common Pleas Court is affirmed.

*Judgment affirmed.*

POTTER, P. J., and WILEY, J., concur.

WILEY, J., retired, was assigned to active duty under authority of Section 6(C), Article IV, Constitution.