UPPERMAN et al., Plaintiffs,

v.

GRANGE INDEMNITY INSURANCE COMPANY et al., Defendants.

2005-Ohio-6227.]

Court of Common Pleas of Ohio,
Franklin County.

Decided November 15, 2005.

Rex H. Elliott, Charles H. Cooper Jr., Aaron D. Epstein, and David A. Goldstein, for plaintiffs.

F. James Foley and Brian J. Laliberte, for defendants.

FRYE, Judge.

### Introduction

{¶ 1} Pursuant to Civ.R. 12(C), defendants seek partial judgment on the pleadings. Defendants present three arguments in support of their motion. First, defendants argue that R.C. 3937.03 does not create a private right of action for the plaintiffs. Next, defendants assert that plaintiffs have not properly pleaded a fraud or fraudulent-concealment claim. Third, defendant Grange Mutual Casualty Company ("Grange") asserts that it is the parent of two operating subsidiaries but that plaintiffs have failed to plead any facts that could lead to its liability for acts of corporate subsidiaries.

### I.   Standard of Review

{¶ 2} Motions for judgment on the pleadings are governed by Civ.R. 12(C), which states: "After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." Under Civ.R. 12(C), "dismissal is appropriate [only] where a court (1) construes the material allegations in the complaint, with all reasonable inferences to be drawn therefrom, in favor of the nonmoving party as true, and (2) finds beyond doubt that the plaintiff could prove no set of facts in support of his claim that would

entitle him to relief." *State ex rel. Midwest Pride IV, Inc. v. Pontious* (1996), 75 Ohio St.3d 565, 570, 664 N.E.2d 931. A Civ.R. 12(C) motion is specifically limited to resolving a question of law. *Peterson v. Teodosio* (1973), 34 Ohio St.2d 161, 166, 63 O.O.2d 262, 297 N.E.2d 113. A judgment on the pleadings is improper if plaintiffs pleaded any facts, or raised any reasonable inferences of fact, that could entitle them to relief. *Flanagan v. Williams* (1993), 87 Ohio App.3d 768, 772, 623 N.E.2d 185. See, also, *Carcorp, Inc. v. Chesrown Oldsmobile–GMC Truck, Inc.*, 159 Ohio App.3d 87, 2004-Ohio-5946, 823 N.E.2d 34, at ¶ 10 ("A Civ.R. 12(C) motion * * * has been characterized as a belated Civ.R. 12(B)(6) motion for failure to state a claim upon which relief can be granted").

## II. Facts

{¶ 3} Grange is alleged to be the parent company of Grange Indemnity Insurance Company ("Grange Indemnity") and Trustguard Insurance Company ("Trustguard"). In November 2000, Grange Indemnity and Trustguard began charging purchasers of nonstandard automobile insurance higher premiums within Ohio. Under R.C. 3937.03, prior to implementing any change in rates, an insurer is required to file a rate-change application with the Ohio Department of Insurance ("ODI"). Grange Indemnity and Trustguard did not comply with R.C. 3937.03. They increased their rates without first filing the rate increase with the ODI. Grange, through Grange Indemnity and Trustguard, sold policies based on these rates to tens of thousands of people. Moreover, at all relevant times, Grange allegedly maintained management and control over Grange Indemnity and Trustguard.

{¶ 4} Every new policy sold to Grange Indemnity and Trustguard policyholders from November 1, 2000, to May 1, 2001, and every renewal policy issued from December 1, 2000, to June 1, 2001, was allegedly issued in violation of R.C. 3937.03(H). On May 30, 2002, ODI notified the defendants that it had discovered that they had not filed their new rate structure as implemented in late 2000. On June 26, 2002, defendants admitted the violation. They also delivered an estimate of the overpayments of premiums they had received as a result of the violation via letter to the ODI. An executive of one, or more, of the defendants sent that letter but his exact corporate position and responsibility are unclear from the signature block. Moreover, the letter was sent on generic "Grange" letterhead. The stationery collectively identified Grange, Grange Indemnity, and Trustguard, along with two other insurance companies and the Grange Bank. Allegedly, prior to suit, defendants failed to notify the affected policyholders of the overcharge and never made any effort to remit the premium overcharges to customers.

## III. Analysis

{¶ 5} Defendants' motion presents three distinct issues. Two arguments pertain solely to Grange Indemnity and Trustguard, and the third is an argument premised upon Grange's asserted parent-subsidiary relationship with Grange Indemnity and Trustguard. The court will first address Grange Indemnity and Trustguard's argument that R.C. 3937.03 does not provide the plaintiffs with a private cause of action.

### A. Plaintiffs have an Implied Cause of Action against Defendants for Unfiled Rates under R.C. 3937.03

{¶ 6} *Cort v. Ash* (1975), 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26, is the leading decision[1] addressing the factors used to determine whether a private remedy is implicit in a statute, although not expressly provided therein. Four factors are examined under federal law. First, is the plaintiff within the class of those for "whose *especial* benefit the statute was enacted[?]" Second, "is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?" Third, "is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?" And, finally, "is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?" Id. at 78, 95 S.Ct. 2080, 45 L.Ed.2d 26.

{¶ 7} Due to the policy reflected in the McCarran–Ferguson Act, 15 U.S.C. 1011, et seq., state law is the repository for insurance regulation in this country. No considerations based in federal law are relevant here. See, also, *Doe v. Adkins* (1996), 110 Ohio App.3d 427, 435, 674 N.E.2d 731 fn. 1.

{¶ 8} As the basis for inferring a private right of action, plaintiffs rely upon statutes explicitly requiring that insurance-premium rates be filed with the ODI. R.C. 3937.03(A) and (H). The court concludes that, given the factual allegations in this case, the three factors relevant under *Cort v. Ash* are all satisfied and that a private remedy for damages ought to be implied in favor of plaintiffs. The key fact presented here is that the defendant insurers violated one of the key, and very straightforward, requirements of the insurance code. Failing to file rates with the ODI, the regulatory agency having oversight, cuts at the heart of the regulatory and marketing system in Ohio.

{¶ 9} Plaintiffs, and the Civ.R. 23 class they seek to represent, allegedly paid higher premiums based upon those unfiled rates. They are properly regarded as

---

1. Among the Ohio decisions that follow *Cort v. Ash* are *Nielsen v. Ford Motor Co.* (1996), 113 Ohio App.3d 495, 501, 681 N.E.2d 470, and *Doe v. Adkins* (1996), 110 Ohio App.3d 427, 435–436, 674 N.E.2d 731.

among those for whose especial benefit the insurance statutes were enacted. Indeed, it is hard to imagine any group more directly affected than those having direct contractual privity with defendants and who paid money to defendants based on allegedly illegal premium rates. Plaintiffs and the Civ.R. 23 class they seek to represent are the only members of the public financially affected by defendants' rate-setting practices, and filing of the rates is not only mandated by Ohio law but is also, practically speaking, the only means available to assure that there is some degree of administrative oversight of rate making. Of course, public filing of rates also serves broader interests, which, an examination of the statutes shows, are also protected by the Ohio insurance code. Public filing assures public availability of cost information about different insurers, thereby allowing both insurance companies and private consumers to make price comparisons. Yet because they had the direct contracts with the defendants and were directly affected financially, these plaintiffs stand in a far different position than some litigants who seek to imply a private right of action. They are before the court not simply as members of the general public interested in seeing that the administrative regulation of insurance operates as intended.

{¶ 10} As to the second and third *Cort* factors, an examination of the insurance code, R.C. Title 39, and more particularly the rate-filing requirements in R.C. 3937.03, offers guidance. The statutes show that it was precisely because the General Assembly wished to have an open marketplace, and also wished to protect policyholders against price gouging or other misconduct by insurers, that the so-called "file and use" rate system was adopted. At the outset it is noteworthy that in adopting the rate-filing requirements in R.C. 3937.03, the General Assemble used very straightforward declarative language. "(A) *Every* insurer *shall* file with the superintendent of insurance *every* form of a policy * * * and rates * * * and *every* modification of any of them which it proposes to use." (Emphasis added.) This command is not easily misunderstood. Likewise, R.C. 3937.03(H) demands that "[n]o insurer shall make or issue a contract or policy except in accordance with filings which are in effect for said insurer as provided" in Chapter 3937. See, also, R.C. 3905.42 ("No company * * * shall engage either directly or indirectly in this state in the business of insurance * * * unless it is expressly authorized by the laws of this state, and the laws regulating it and applicable thereto, have been complied with").

{¶ 11} While defendants point out that no private right of action is provided by R.C. 3937.03, the reverse is also true. Nowhere in the insurance code is it explicitly stated that a private implied right of action is not available as a supplement to other remedies for those affected by noncomplying insurers. Likewise, there undeniably are administrative remedies provided under certain circumstances by the ODI, and when those are available, one can more easily

conclude that they eliminate any need for an implied private cause of action. Certainly the most relevant of the administrative remedies is found in R.C. 3937.04(B), which provides that any person or organization aggrieved by a filed rate may obtain a hearing with the ODI, and the superintendent may order changes to the rate. However, that was unavailable here because no filing by defendants ever took place.

{¶ 12} The insurance industry has been heavily regulated in Ohio for decades. The regulation reflects experience and abiding concern that, left unregulated, unscrupulous insurers will take advantage of the public. This court concludes, therefore, that the General Assembly never contemplated that policyholders should be left without recourse if an insurer operates outside the regulatory structure. Yet that is exactly what is alleged to have occurred here. Defendants improperly charged premiums that had not been filed with, and at least implicitly approved by, the ODI. In such a circumstance, policyholders have a private remedy to seek damages. Policyholders should not be exposed to harm when insurers do not follow statutory requirements at the core of the regulatory system.

{¶ 13} Defendants point out that R.C. 3937.99 makes the purposeful violation of R.C. Chapter 3937 a fourth-degree misdemeanor, punishable by up to a $500 fine. That, they argue, suggests administrative or criminal enforcement is all that the legislature could ever have had in mind. While defendants make much of this criminal-penalty provision, there are at least two reasons why it is essentially irrelevant. *Cort* recognizes, first of all, that even the availability of a criminal penalty does not necessarily preclude implication of a private cause of action for damages. Id., 422 U.S. at 79, 95 S.Ct. 2080, 45 L.Ed.2d 26. Second, the possible penalty of a $500 misdemeanor fine is a relic of times long past. It has no genuine economic consequence in the modern economy. Indeed, by comparison, the mandatory fines now routinely required in cases involving convicted drug dealers are many multiples of $500.

{¶ 14} A more serious remedy, although only an administrative one, is offered by R.C. 3937.14, which allows a license suspension for any insurer that willfully withholds information or gives false or misleading information to Ohio insurance regulators. If permanently imposed by the ODI, a license suspension would be the economic equivalent of capital punishment on a corporate offender. However, even a permanent license suspension would do nothing, in a circumstance like this one, to redress the actual financial harm suffered by individual Ohio insurance customers. Again, despite defendants' protests, the court concludes that an implied right of action for damages is a reasonable supplement to the other more limited remedies provided by statute.

{¶ 15} Of even more assistance in determining whether the second and third factors under *Cort* are met is R.C. 3937.17, which provides that R.C. Chapter 3937 is to "be liberally interpreted to the end that insurance rates shall not be excessive, inadequate, or unfairly discriminatory," while also recognizing the need for "reasonable competition" among insurers. Nevertheless, defendants argue, the ODI has adopted administrative rules on unfair or deceptive insurance practices in Ohio Adm.Code 3901–1–07, so those should be enough. However, the availability of those remedies does not fully respond to the broad and emphatic requirements separately stated in R.C. 3937.03(A) and (H), which were violated here and which lie at the core of the regulatory system. Beyond that, some meaning must be given to the legislative direction that these statutes be "liberally interpreted" so that rates are not excessive and so that there is reasonable competition in the Ohio marketplace. Furthermore, any prohibitions by ODI against "unfair or deceptive practices" will often have limited scope and may affect only a small group—or perhaps only a single agent who treats a single policyholder unfairly. An insurer's failure to file its rates before selling policies of insurance is at a wholly different and far more serious level, having a far broader impact. Here, according to the complaint, 37,529 policies were issued involving $17 million in unapproved premiums. The unfair- or deceptive-practices rules do not address that magnitude of misconduct.

{¶ 16} Defendants argue that the decision in *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.* (July 12, 1995), 9th Dist. No. 16993, 1995 WL 422733, precludes finding an implied right of action in this circumstance. That decision is readily distinguishable. *Goodyear Tire* addressed the "standard" pollution exclusion from comprehensive general liability ("CGL") policies. However, in an earlier decision the Supreme Court of Ohio had ruled that exclusion did not violate public policy and was an enforceable restriction on CGL policy coverage. *Hybud Equip. Corp. v. Sphere Drake Ins. Co. Ltd.* (1992), 64 Ohio St.3d 657, 597 N.E.2d 1096. Thus, those seeking to avoid the pollution exclusion in *Goodyear Tire* took a new tack. They argued that long prior to the Ohio Supreme Court decision in *Hybud* the pollution exclusion had been approved in Ohio only through misrepresentations to the ODI.

{¶ 17} Arguments that misrepresentations to insurance regulators and misleading marketing techniques were used by the insurance industry to gain acceptance of the pollution exclusion were, to say the least, a novel back-door attack on *Hybud*. Leaving that aside, there is a key factual difference between the situation presented in *Goodyear Tire* and that presented by plaintiffs in this case. In *Goodyear Tire*, there had been filings with the ODI; here there were none. In *Goodyear Tire*, the recognition of a private right of action would, effectively, have had the courts second-guess the administrative-review process used with

regard to the pollution exclusion. Here, administrative review never occurred because the defendants never made a filing to trigger it. Defendants may not gain the legal protection of the administrative review process when they did not invoke it with an appropriate rate filing. Moreover, *Instrumentation Technology, Inc. v. Beacon Ins. Co. of Am.* (Apr. 14, 2000), Lake App. No. 99–L–036, 2000 WL 522252, casts doubt on the breadth of the holding in *Goodyear Tire,* but resolution of the exact scope of an implied private remedy under R.C. 3937.03 can await development in future cases.

{¶ 18} *Cort* and earlier decisions recognize that "it is the duty of the courts to be alert to provide such remedies as are necessary to make effective the [legislative] purpose." Id., 422 U.S. at 84, 95 S.Ct. 2080, 45 L.Ed.2d 26. Defendants' alleged conduct in this case was at odds with the statutory priorities set by the legislature and the regulatory obligations of the ODI. Perhaps more importantly, it also distorted the public marketplace for liability insurance. Allowing an implied private right of action for damages in the circumstances described in plaintiffs' complaint will not interfere with the ongoing enforcement activities of the ODI; it will merely supplement them. A private right of action seeking recovery of illegally charged insurance premiums will not interfere with reasonable and fair competition in the marketplace; to the contrary, it will reinforce the need for accurate and timely rate filings. Furthermore, the mere public availability of timely and accurate insurance-rate information affects the broader marketplace, which is harmed by conduct like that alleged here. Absent accurate and timely filing of rates, an insurer interested in entering the Ohio marketplace cannot readily determine what rates are being charged by Ohio insurers. The same is true for those already selling insurance here. Insurers who can readily obtain accurate rates from those on file at the ODI can decide whether to enter and compete for business in Ohio, or if they are already here, can decide whether to adjust their own premium rates downward to garner more business and interject more competition into the marketplace. Ordinary consumers also directly benefit when they can comparison shop when selecting from among available suppliers of liability insurance. Providing a private damages remedy in this circumstance is consistent with Ohio law and preserves the open marketplace the General Assembly intended to encourage.

{¶ 19} The court next turns to Grange Indemnity's and Trustguard's argument that plaintiffs' pleading fails to state a claim for fraud.

### B. Plaintiffs' Complaint States a Fraud Claim

{¶ 20} The elements of fraud or fraudulent concealment are as follows: (1) a representation, or a concealment of fact when a duty to disclose exists, (2) which fact is material to the transaction at hand, (3) made falsely, with knowledge of its

falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge can be inferred, (4) with the intent of causing another to rely on it, (5) justifiable reliance on the representation or concealment, and (6) injury proximately caused by the reliance. *Burr v. Stark Cty. Bd. of Commrs.* (1986), 23 Ohio St.3d 69, 23 OBR 200, 491 N.E.2d 1101, paragraph two of the syllabus.

{¶ 21} Grange Indemnity and Trustguard are not entitled to judgment on the pleadings on plaintiffs' fraud claim. Construing all inferences in favor of plaintiffs, a cognizable fraud claim may exist against Grange Indemnity and Trustguard. First, Grange Indemnity and Trustguard concealed the fact that they received from their customers premiums to which they may not have been entitled. Second, while this fact may not have been material to the initial decision to purchase insurance, it is material to a customers decision to seek a refund of the excess premiums. Third, Grange Indemnity and Trustguard knew that they were not entitled to the excess premiums. This fact is evidenced by the letter, attached as Exhibit A to the complaint, submitted by defendants to the ODI. Fourth, Grange Indemnity and Trustguard's silence to their customers could be seen as an intention to allow them to rely on the assumption that they had paid rates that were legal. Fifth, Grange Indemnity and Trustguard's customers were justified in relying on their insurers' concealment. Finally, there is no doubt that Grange Indemnity and Trustguard's customers were damaged. Defendants have charted the potential damage to their clients, as shown in Exhibit A to the complaint.

### C. Plaintiffs have Made Sufficient Allegations to Hold Grange Liable for the acts of Grange Indemnity and Trustguard

{¶ 22} Grange contends that it should be dismissed from this action because it cannot be held liable for the acts of its subsidiaries. Grange's liability for Grange Indemnity and Trustguard's actions turns on plaintiffs' ability to pierce the corporate veil. The cardinal case on piercing the corporate veil is *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos., Inc.* (1993), 67 Ohio St.3d 274, 617 N.E.2d 1075. The Ohio Supreme Court held that the corporate form could be disregarded and a parent corporation could be held liable for a subsidiary's action when "(1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong." *Belvedere* at paragraph three of the syllabus.

{¶ 23} Plaintiffs allege that Grange, through Grange Indemnity and Trustguard, sold policies using an unapproved premium rate schedule. Further, Plaintiffs allege that Grange maintained management and control over Grange Indemnity and Trustguard at all times. Next, plaintiffs allege that defendants failed to refund the premiums they had illegally charged plaintiffs. Finally, as discussed above, plaintiffs incorporate by reference a letter from Barry Hunlock, vice president Ohio/Michigan personal lines, to the ODI that shows that at least one executive was aware of the decision not to refund the illegally charged premiums to Grange Indemnity and Trustguard customers. The allegations of the complaint and inferences reasonably drawn, taken as true, could support a finding that Grange maintained control over Grange Indemnity and Trustguard such that Grange itself made the decision not to refund overcharged premiums. The letterhead used by Hunlock is not clear with respect to the position or authority of Hunlock, or whether he was acting for Grange the parent company or for a subsidiary. The generic letterhead is apparently used by Grange, interchangeably with Grange Indemnity, Trustguard, and other businesses. Thus, Grange is not entitled to judgment on the pleadings.

## *IV. Conclusion*

{¶ 24} The motion for partial judgment on the pleadings is denied.

Motion denied.